## ALDRICH v. WRIGHT.

The "natural, essential, and inherent" right of "protecting property," declared in Article 2 of the bill of rights, is the right to do whatever, under the circumstances of each case, apparently is reasonably necessary to be done in defence.

The statute (Gen. Stat., ch. 251, sec. 2) prohibiting the destruction of certain fur-bearing animals between May 1 and Oct. 15, is not applicable to cases in which such destruction is an exercise of the constitutional right of protecting property.

The killing of wild vermin in defence of property, may be apparently reasonably necessary in apparent danger not actual. Such a case is not governed by the tests of imminent danger and of the duty of retreating to the wall, applied in cases of homicidal defence.

DEBT, by Arthur R. Aldrich against Wells Wright, to recover the penalties prescribed by sec. 2, chap. 251, General Statutes, for killing minks. The defendant admitted the killing of four minks, but alleged, in justification, that the animals were at the time pursuing his geese.

The only evidence in the case was the testimony of George W. Blood, who, in common with the defendant, owned a small goose-pond. The dividing line between the premises of the witness and the defendant was the brook running into this pond; and the houses occupied by the witness and the defendant were on the opposite sides of the brook and but a few rods distant therefrom. The witness testified as follows: "I stood in my dooryard; heard the geese cackling; I came out on to a little knoll; I saw the four minks swimming towards the geese; some of the geese had then got on to the shore of the pond and some of them were in the water; the minks were from one to three rods distant from the geese; some of the geese within a rod of the minks, who were one old mink and three young ones, but all about the same size. As soon as the minks saw me they stopped pursuing the geese, and ran out upon a little island and there stopped. At the same time that I came out the defendant also came out with his gun; he came out near the end of a causeway that is laid across the lower end of the pond, and fired at the minks on the island, killing them all at one shot; the minks were all on the island when he fired; the defendant carried the minks off to his house; the geese were six old ones, and eight young ones about half grown; geese had run in the pond two or three summers; never knew of any mink chasing any geese there before or since; don't know whether minks are accustomed to kill geese or not."

A verdict was taken for the plaintiff by consent, subject to the defendant's exception to a *pro forma* ruling that the defendant would not be justified in killing the minks if the geese were not in imminent

danger, and could have been protected either by driving away the geese, or frightening or driving off the minks.

*Ray, Drew & Heywood,* for the defendant.

*G. A. Bingham* and *Aldrich,* for the plaintiff.

DOE, J.* "All men have certain natural, essential, and inherent rights; among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property." Bill of rights, art. 2. In this declaration of the right of defending life and liberty, and protecting property, the bill of rights, more properly called the declaration of rights, professes to set forth a mere recognition of a natural right. The right thus recognized is maintained by the elementary principles of the common law, which are, in general, adopted by the ninetieth article of the constitution, subject to legislative alteration and repeal : as a fundamental and essential right, the defence of life, liberty, and property is here put, by a special guaranty, above the altering and repealing power of the legislature.

The statute on which this suit is brought provides that "No person shall in any way destroy, between the first day of May and the fifteenth day of October of each year, any mink, bearer, sable, otter, fisher, or muskrat, under penalty of $10 for each animal so destroyed." Gen. Stat., ch. 251, sec. 2. The plaintiff's construction of this statute, presented. in the *pro forma* ruling, admits the defendant's right of defending his geese, notwithstanding there is no clause in the statute expressly excepting and saving the right. As the legislature could not abolish the right, they are not presumed to have attempted an impossibility, or to have intended to pass a void act ; and the statute is held valid by giving it a construction compatible with the constitution, making it applicable only to those cases to which it can be constitutionally applied. Between May 1 and October 15, the defendant could not lawfully kill these minks for their fur, or in sport or wantonness, or for any past pursuit or disturbance of his property however vexatious, or for any other mischief committed, however serious ; but he could lawfully protect his property against them between May 1 and October 15, as well as at any other time. If they had consumed his entire stock of poultry, he could not have justified his shot for obtaining their skins as the only available redress for their depredations : but, while one of his birds remained, he could lawfully defend it. He could have no indemnity for the past : but he was entitled to security for the future. Much as the statute had abridged his rights of hunting and reprisal, it had put him under no obligation to suffer the minks to eat, injure, or annoy his domestic fowls. His natural, common-law, and constitutional right of defence existed in full force and vigor, not repealed, nor in the slightest degree impaired or modified by the statute.

---

* LADD, J., having been of counsel, did not sit.

He could exercise that right as fully and freely as if the statute had not been enacted. What.was that right? This is the only question in the case.

Higher and earlier in its origin than the constitution or the common law, not superseded by those temporal and finite systems, but sustained and enforced by their declaration and sanction of the highest, primary, eternal, and infinite law of nature—3 Bl. Com. 4; 1 Hale P. C. (Am. ed. of 1847) 479, note 1*—the right of defence cannot be prescribed within the limits of a narrow technical rule. It is an original and comprehensive prerogative, necessarily ascertained and defined by natural reason. It is not established by any fallible authority, nor measured by any precedent, nor restricted by any arbitrary dogma. Long upheld by the common law, it has, under the administration of that law, theoretically been what it was before; and now, reinforced by a constitutional guaranty, it is what it has always been. The authorities of the common law show what it has been held to be by men whose opinions are entitled to great consideration. If any discrepancy should be found in the definitions of it given by common-law precedent and by natural reason, the latter must prevail, because the right is explicitly asserted in the bill of rights as a natural right, and not as one defined by common-law authorities. But, between the natural right and its common-law definition rightly understood, there is no variance that concerns the present inquiry. In the general terms of its common-law definition, the right of defence is the right to do whatever apparently is reasonably necessary to be done in defence. And .the verdict in this case, taken by consent upon the doctrine asserted by the plaintiff, subject to exception, must be set aside, because that doctrine conflicts, in three particulars, with the right of defence.†

I. The first error is, limiting the right of defence by the bounds of real instead of apparent danger.

1. A aims a pistol at B with threats which induce B to reasonably apprehend that the pistol is loaded, and that A intends to shoot him, B may disarm A at once, although it turns out that the pistol is not loaded, and that A intends only a harmless jest. A is estopped to deny that the fact is what his conduct induces B reasonably to believe and reasonably to act upon. B is not obliged to wait for the question of actual danger to be solved by an experiment which seems likely to destroy his right of defence. And if, in the use of reasonably necessary means to avoid the apparent danger, he kills A, one ground on which his innocence may rest is, the reason of the doctrine of estoppel. By putting him in apparent peril, A invites him to defend himself; and A cannot put him in actual peril of capital punishment by inducing him to accept the invitation.

---

*And see Horrigan & Thompson Cases on Self-Defence 871.

REPORTER.

† Many American cases on these points are collected in Horrigan & Thompson Cases on Self-Defence, published since this opinion was delivered.

REPORTER.

In this case the question is, not of the real danger merely, but also of the danger, on reasonable grounds, really believed by the defendant to exist.   He might have entertained, and had good cause to entertain, erroneous ideas of the character of the minks.   Their pursuit of the geese, some of whom were young, was a seeming threat, and an overt act calculated to excite a suspicion of hostile designs, and ability to execute them.   The evidence against them tended to show what, in a human creature, would be the ordinary symptoms of a felonious spirit regardless of social duty and fatally bent on mischief.   And if they never did and never could kill a goose of any age, their reputation might be bad ; and their reputed character was one of the circumstances of apparent danger or apparent safety.   A person attacked has no right to kill his assailant for the purpose of punishing a bad or desperate man, or of ridding the world of a ruffian—4 Bl. Com. 178, 184; but the character of the assailant for ferocity, or peaceableness, known to the party attacked, is circumstantial evidence of apparent peril or apparent security, upon which he may be authorized to act.   An atta upon a dangerous man may be unjustifiable : but the dangerous char acter of an assailant is a legitimate reason for apprehending danger, and employing speedy, energetic, and sure means of defence.  *Harrison* v. *Harrison*, 43 Vt. 417; Wharton Cr. L., secs. 641, 1026, 1027.   The numerous authorities,* in other jurisdictions, holding a different do trine, are not consistent with the natural right of defence declared i our bill of rights.

The reputation of the minks, their pursuit of the geese, and the alarm and retreat of the latter, may have shown apparent danger, when the real character of the pursuers may have created no actual danger. Mr. Blood, a near neighbor of the defendant, did not know whether minks are accustomed to kill geese or not.   The defendant may have been equally uninstructed.   And it was not his duty to postpone the defence of his property until, neglecting his usual occupations and incurring expense, he could examine zoölogical authorities, consult experts, or take the opinion of the county, on the question whether his " half-grown " geese were actually endangered, in life or limb, by the incursion of " one old mink and three young ones," " all about the same size."   The conclusion of the investigation might be too late. And if the question were found to be a debatable and doubtful one, it would not be his duty to settle it by a trial at his own risk.   The plaintiff's doctrine destroys the right of defence which exists in a case of merely apparent danger.

II.  The plaintiff's claim that the defendant is liable if the geese were not in imminent danger, taken in the sense for which the plaintiff contends, and the sense in which both parties, at the trial, probably understood it, cannot be sustained..

The term " imminent " does not describe the proximity of the danger by any rule of mechanical measurement; and, in its broad and

---

* Horrigan and Thompson Cases on Self-Defence 238–696.

popular signification, admitting a large degree of latitude and adaptation to circumstances, it may be properly used in this case. But it has been so much used in cases of defence against a human aggressor, and, in that class of cases, has, for peculiar reasons, acquired a legal meaning so special, restricted, and technical, that, if used in a case like the present, it should be accompanied by some explanation of the general comparative and relative sense in which it is used.

The reserved case states that Mr. Blood, in common with the defendant, owned the pond. Taking that to be the condition of the title, the defendant's rights, so far as they are involved in this case, were the same as if he alone had owned the pond including the island. But supposing, what the case undoubtedly means, that the boundary line, between the lands of Mr. Blood and the defendant, ran through the pond, as well as through the middle of the brook that flowed into the pond, the minks and geese may have been on premises of which the defendant was sole and absolute proprietor. But it is immaterial how that is, because the defendant was evidently in the actual and legal use and occupation of his own part of the pond in his own right, and of the rest of it by the license of Mr. Blood. It is not claimed that the defendant, as a trespasser, killed the minks on Mr. Blood's land without his consent. This is not trespass *qu. cl.* brought by Mr. Blood against the defendant. For the legal purposes of this case, as between the defendant and the minks, the pond and island were the pond and island of the defendant; his geese were rightfully there, and the minks were there without right. And there was something to be done; for there was no duty of living with or yielding to intruders who manifested a propensity to eat their co-tenants.

Defensive force, in its kind, degree, and promptness, is measured by the consequence of using it, and the consequence of not using it: it should be proportioned to the apparent danger, viewed in the light of those consequences contrasted with each other. When force, purely defensive at first, increases and becomes more than is reasonably necessary for defence, the excess is aggressive and not defensive. When resistance starts beyond the reasonable necessity of the case, it may be divisible into two parts; so far as it is reasonably necessary, it is resistance; so far as it is not reasonably necessary, it is aggression. But this is to be understood in the liberal sense of the law. When it is reasonably necessary for A to shoot B who is about to shoot him, A's shot is, in form, aggressive; but in substance and contemplation of law, it is defensive. In the present case, the defendant's act was defensive, if apparently it was reasonably necessary in quality, quantity, and time for the protection of his geese; and it was not defensive, if apparently and really it was not reasonably necessary.

To justify the defensive destruction of human life, the danger must be, not problematical and remote, but evident and immediate. If a man, after pursuing the defendant as the minks pursued his geese, had retreated to the island, with no means of doing harm while he remained there, and there had been no reasonable ground to believe he would

make an immediate attack, the time would not have been a reasonably necessary one for shooting him. The defendant would not have been in imminent danger, in the technical sense of the authorities, which hold that a man's life is never in imminent danger of a human assault so long as he can safely run away. But imminent danger is relative, and not absolute, and is measured more by the nature of consequences than by the lapse of time. It is not a condition of things in which the party, whose person or property is imperilled, is allowed to anticipate, and prevent the impending mischief by making a deadly defence only a precise and invariable number of seconds, minutes, hours, or days before the mischief would happen without such defence. The law does not fix the distance of time between the justifiable defence and the mischief, for all cases, by the clock or the calendar. The chronological part of the doctrine of defence, like the rest of it, is a matter of reasonableness; and reasonableness depends upon circumstances.

In defence, it may be reasonable that a man should strike quicker for human life than for property; that he should strike quicker at an habitual fighter, professional robber, or notorious assassin, from whom there would be reason to expect sudden or extreme violence, than at a man previously inoffensive, from whom there would be little reason to apprehend a serious attack; that he should strike quicker at a strong man than at a weak one; that he should shoot a dog quicker than he should shoot a man; and that he should shoot mischievous wild animals, which are the absolute property of nobody, quicker than he should shoot a valuable domestic animal, the property of his neighbor. The consequences of shooting, compared with the consequences of not shooting, are material to be considered on the question when he should shoot, as well as on the question whether shooting is a defence of a reasonably necessary kind.

Imminence of danger, in this broad and relative sense, creating a reasonable necessity, was the test of the defendant's right. But this test, by its frequent application to the defensive right of destroying human life, is so liable to be misunderstood, when applied to the defensive right of destroying mischievous wild animals, that some explanation of it is necessary in a trial of this case. It is probable that the parties understood that, by the doctrine of imminent danger, the defendant was liable unless the geese would, in a few moments, have been killed by the minks but for the defendant's shot. The doctrine, asserted in that form, would be erroneous. It was for the jury to say, considering the defendant's valuable property in the geese, the absence of absolute property in the minks, their character, whether harmless or dangerous, the probability of their renewing their pursuit if he had gone about his usual business and left the geese to their fate, the sufficiency and practicability of other kinds of defence,—considering all the material elements of the question, it was for the jury to say whether the danger was so imminent as to make the defendant's shot reasonably necessary in point of time. If, but for the shot, some of the geese, continuing to resort as usual to the pond, apparently would have been killed by

these minks within a period·quite indefinite, and if other precautionary measures of a reasonable kind, as measured by consequences, would have been ineffectual, the danger was imminent enough to justify the destruction of the minks for the protection of property.

The right of defence is the right to do whatever apparently is reasonably necessary to be done in defence under the circumstances of. the case. The English practice of the judge advising the jury on the facts and weight of the evidence—*State* v. *Pike*, 49 N. H. 416, 417, 436 ; *State* v. *Hodge*, 50 N. H. 520 ; *Greenwood's case*, cited in *White* v. *Wilson*, 13 Ves. 89 ; 1 Hale P. C. 570 ; *Bradford* v. *S. C. R. Co.*, 7 Rich. 201 ; *Matthews* v. *Beach*, 5 Sandf. 256, 266—and drawing, from circumstances stated ˙in special verdicts, conclusions which have often been matters of fact—1 Hale P. C. 478 ; *Cook's case*, Cro. Car. 537 ; East P. C., ch. 5, sec. 47 ; 1 Bishop Cr. L., sec. 847, 5th ed.—and the general tendency of English courts to encroach upon the province of the jury, have carried into the reports many opinions of what is and what is not reasonably necessary, which are opinions of fact and not of law ; and authors of legal treatises have naturally followed the judicial precedent, and·expressed opinions of a like .character. Nearly if not quite all the doubt, obscurity, and conflict supposed to exist in the common law of defence, exist not in the law, but in these opinions of fact mistaken for opinions of law. When it is held that evidence tending to show a certain kind, degree, and imminence of danger did or did not justify a certain kind, degree, and celerity of violence in warding off the danger, the decision is a comparison of the probable consequences of using the violence, with the probable consequences of not using it, and an inference of fact drawn from the comparison, that the violence was or was not commensurate with the danger, and, consequently, that the violence was or was not reasonably necessary.

On the subject of defending a man's property, in his absence, by spring guns, man-traps, or other engines calculated to destroy human life or inflict grievous bodily harm, the English courts turned a question of fact into a question of law, and were not successful in their efforts to prescribe adequate rules for determining the reasonable necessity of such engines under the varying circumstances of different cases. *Deane* v. *Clayton*, 7 Taunt. 489 ; *Ilott* v. *Wilkes*, 3 B. & Ald. 304 ; *Bird* v. *Holbrook*, 4 Bing. 628 ; *Jordin* v. *Crump*, 8 M. & W. 782 ; *Wootton* v. *Dawkins*, 2 Com. B. (N. S.) 412 ; *Loomis* v. *Terry*, 17 Wend. 496 ; *Johnson* v. *Patterson*, 14 Conn. 1 ; *State* v. *Moore*, 31 Conn. 479 ; *Gray* v. *Combs*, 7 J. J. Marsh. 478, 483 ; Sidney Smith on Spring Guns (Phila. ed. of his Essays, 1848), pp. 150, 227 ; 10 Campbell's Lives of the Chancellors 63. This error of the courts was partially corrected by acts of parliament—7 & 8 Geo. IV, c. 18, secs. 1, 2, 3, 4 ; 24 and 25 Vict., c. 100, sec. 31—making it a misdemeanor to set such engines except in a dwelling-house, for the protection thereof in the night, and excepting such gin or trap as may have been or may be usually set with the intent of destroying vermin. If the courts had refrained from the

invasion of the province of the jury, it would not have been necessary for the legislature to make this imperfect restoration of the common law, or to provide penalties for its violation. If the reasonable necessity of employing defensive machinery of all kinds had been left to the jury, as such a question of fact should hav' 'een, much judicial and legislative trouble would have been avoided nd the general principles of the common law would have been suⁿⁱ.ient. The evil effects of holding fact to be law, practically demonstrated in this branch of the doctrine of defence, should operate as a warning against similar mistakes.

It is reasonable that the kind and amount of defensive force should be measurably proportioned to the kind and amount of danger, to the apparent consequences of using the force, and the apparent consequences of not using it. The probable consequences on both sides are to be considered and compared. There is a great difference between an attack made upon A by B, and an attack made upon him by B's dog. On A's side, the consequences of his being killed by B, and the consequences of his being killed by B's dog, may not be materially different. But on the other side, the consequences of his defending himself by killing B, and the consequences of his defending himself by killing B's dog, regarded from a human point of view which is the one adopted by human law, are very different. The difference in the common-law values of the lives destroyed exhibits the reasonableness of adjusting the quality, quantity, and time of defensive force with some reference to consequences. A, when attacked by B, may kill him if it is reasonably necessary to do so: when attacked by B's dog, he may kill the dog if it is reasonably necessary to do so. But a kind, degree, and imminence of danger caused by the attack of the dog might make it reasonably necessary to kill him; although the same kind, degree, and imminence of danger caused by B's attack might not make it reasonably necessary to kill him. If A were not in danger of being killed or grievously injured by B's attack, it might be unreasonable to destroy B's life, when it would be both reasonable and highly meritorious to destroy the dog's life, though his attack caused no more danger than the attack of B. An assault and battery committed by the dog might justify his destruction — *Credit* v. *Brown*, 10 Johns. 365 — although a similar assault and battery committed by a man might not justify homicide, " the law distinguishing, to many and most essential purposes, between property and the life of man." DALLAS, J., in *Deane* v. *Clayton*, 7 Taunt. 518. The right to kill a man in self-defence is not the test of the right to kill a dog in self-defence. Reasonable necessity is the test in both cases: but what is reasonably necessary against a canine assailant may not be reasonably necessary against a human one, although the same danger be caused by each. The dominion of man over brutes is a part of the natural order recognized by the common law; and, judging by the human standards of the common law, and taking them as the perfection of human reason, it is reasonable that a man should discriminate between the consequences of killing a

man and the consequences of killing a dog, because the common law estimates human life and human limbs as vastly more valuable than all things commonly regarded as property, and estimates canine life as comparatively worthless, dogs and cats being classed with domesticated vermin. 1 Bl. Com. 130; 4 *id.* 182, **235; 2 *id.* 393; 1 Hale P. C. 512; 1 Hawk. P. & C., ch. 33, sec. 23; *Findlay* v. *Bear*, 8 S. & R. 571; *Woolf* v. *Chalker*, 31 Conn. 121.

There is also a great difference between an attack made upon A by B, and an attack made upon A's dog by B. A, being attacked by B with a deadly weapon, may instantly kill him, if it is necessary to do so to save his own life; but A's dog being attacked by B in the same manner, the authorities would not justify A in instantly killing B, even if the dog's life could not otherwise be saved.

These illustrations present the defensive destruction of life, founded as it is, by law and by natural reason, upon the consequences of destruction compared with the consequences of non-destruction. It is evident that, in many cases of equally imminent danger, the right of destruction depends upon the question whether the assailant is a man or a brute, and upon the question whether the party assailed is a man or a brute. An undiscriminating rule of imminent danger abolishes these distinctions, and tries the defendant by the tests of murder. Why, then, was he not indicted and tried for murder, instead of being harassed by this petty suit?

*Brill* v. *Flagler*, 23 Wend. 354, was trespass for killing a dog. The defendant pleaded that the dog was accustomed to come upon the close of the defendant in the night-time as well as in the day-time, and by his barking and howling annoy and disturb the defendant and his family; and the plaintiff did not restrain the dog from coming upon the defendant's premises, though requested so to do; and because the dog was upon the defendant's premises and about his dwelling-house at the time, &c., annoying, incommoding, and disturbing him and his family, and because the dog could not otherwise be restrained, the defendant killed him. This was held a good plea, on the ground that the noise of the dog was an intolerable nuisance, justifying the violent defence; that it would be a mockery to refer the defendant to the remedy of an action against the plaintiff, which would be far too dilatory and impotent for the exigency of the case; that the peace and repose of a man's family are to be regarded in the law as at least equal in value to the life of a dog; and that the death of the plaintiff's dog was essential to the free and perfect enjoyment by the defendant of his property, as well as to the protection and comfort of his family. But, if the barking and howling had been continued by the plaintiff himself, after the death of his dog, the difference between the legal values of human and canine life would have been a material circumstance to be considered, on the question of the reasonableness of the defendant killing the plaintiff as a method of abating the continued nuisance. *Loomis* v. *Terry*, 17 Wend. 499. There was just cause for killing the dog; but killing his owner for a like cause, according to the authorities, would be murder.

The immense value at which the law appraises human life makes it legally reasonable that the destruction of it, as a means of averting danger, should be resorted to only when the danger is immense in respect of consequences, and exceedingly imminent in point of time. But the extent of danger and the degree of imminence requisite to justify a deadly defence against a human aggressor, were not requisite to justify the act of the defendant in this case.

On the question of the reasonable necessity of his act, the insufficiency and impracticability of other more tardy and less vigorous kinds of defence are to be considered.

A violent ejection of a human trespasser from one's premises may be unnecessary, if the trespasser will depart when ordered off. It may be reasonable to notify him to leave before using violence to expel him, when a notice will evidently be as effectual as force. If an order is enough to accomplish the object, violence may be excessive; when a word is a sufficient defence, a blow may be an attack and not a defence. But this defendant was not bound to give these intruders notice to depart, because it would probably have been worse than useless. If, by noisy and harmless demonstrations, he had endeavored to make known his desire that they should retire from his premises and trouble him no more, they might well have taken the notice as a sign of present danger, and a warning to instantly secrete themselves. How large the pond and island were, and what was the character of that part of the country, the case does not inform us; but there probably was an abundance of secure retreats for such animals within gunshot. At all events, frightening them away might not be a reasonable task to impose upon the defendant. Their ability to quickly conceal themselves in that vicinity might be materially increased by their amphibious character. And it was not reasonably necessary for him to throw away his only opportunity of a feasible defence, by causing them to betake themselves to some near hiding-place, where they could safely await his departure.

*Taylor* v. *Newman*, 4 B. & S. 89, was an action brought to recover a penalty imposed by statute for unlawfully killing a domestic pigeon. A farmer, annoyed by a flock of pigeons which were in the habit of feeding upon his land, notified their owner that he should be compelled in self-defence to shoot them if they were not prevented from doing further injury to his crops. Finding them afterwards feeding in his field, he fired at them, and thereby caused them to rise, and then fired again and killed one of them. It was argued, for the plaintiff, that the killing of the pigeon after it had risen from the ground was an act unnecessary for the protection of the crops; but MELLOR, J., said it would have been on the ground again after the firing of the gun was over. That was the objection to frightening the minks: they would have been on the ground after the frightening was over. In *Evans* v. *Lisle*, 7 C. & P. 562, where persons had climbed into a church tower and were ringing the church bells, an unsuccessful attempt was made to dislodge them with the fumes of burning brimstone. If such a

method would have expelled the minks, the law of nature and reason does not enjoin the removal of one nuisance by the introduction of another.

*Howell* v. *Jackson*, 6 C. & P. 723, was trespass for false imprisonment, brought against the keeper of a public house. The defence was, that the plaintiff conducted himself in a riotous, quarrelsome, disorderly, and uncivil manner, and committed a breach of the peace in the defendant's house, and, though requested to depart, refused so to do ; and the defendant caused him to be taken into custody by a policeman, and removed to a watch-house, and detained until he could be taken before a magistrate. The policeman testified that he went into the defendant's house, and found the plaintiff and five or six other young men "skylarking, bonneting, and kicking up a rumption ; and there was a piece-of-work." The verdict was for the defendant. The course taken by the tavern-keeper was not open to Mr. Wright.

When a human trespasser, who disregards a notice to quit, can be expelled by gently laying hands upon him, it may not be reasonably necessary to use a higher degree of violence. In actions for assault and battery, a common justification is, that the plaintiff, though requested, refused to leave the defendant's close, whereupon the defendant *molliter manus imposuit*. But *molliter manus imponere* was one of the prime difficulties of this defendant. Besides, if he could have gently laid his hands on these creatures, what could he lawfully do with them ? He would not be bound to support them in close confinement; and if he could not shoot them, he could not put them to death by starvation. He could not deposit them on the land of another person without making himself liable to an action of trespass. He might set them down on his own land in the highway ; but he would not expect them to stay there. If he carried them away a short distance, they would have a short distance to come back. *Wood* v. *Gale*, 10 N. H. 247. The further he carried them, the better opportunity they would have to return before him. If he could put them out of his premises, how could he keep them out? Cattle may be excluded by fences ; and, when found damage feasant, may be impounded at their owner's expense : but these remedies were not adapted to the nature of this case.

Neither was there a remedy in guarding the fowls day and night. The profit accruing from six old geese and eight young ones would not pay the expense of constant convoy. His property might as well be consumed by the minks as by the cost of a guard. But, however small the value of the property, he had a right to protect it by means reasonably necessary : reasonable necessity included a consideration of economy : and eternal vigilance, as the price of success in his limited anserine business, was not reasonable. According to the precedent of charging the watch to bid any one stand, and, if he will not stand, to let him go, the defendant should have been thankful if the minks, when challenged, had gone off : but their halt at the island showed no inclination to go any considerable distance. What practicable method

was there of protecting the geese in the peaceful possession and enjoyment of the pond? Without a resort to fire-arms, his situation would seem to have been full of embarrassment. The invasion of his premises was annoying: the legal perplexities, with which it is now claimed he was environed, had they been understood by him at the time, would have been distressing.

If (as a jury would probably find the fact to be) it apparently was reasonably necessary for him to kill the minks in order to prevent their doing mischief to his property, the authorities do not show that he transcended the right of defence.

*Wadhurst* v. *Damme*, Cro. Jac. 45, was trespass for killing a dog. The defendant pleaded that one Willoughby had a warren, whereof the defendant was warrener, and that the plaintiff's dog was divers times killing conies there, and therefore the defendant, finding him there running at conies, killed him. This was held a good plea; "because, it being alleged that the dog used to be there killing conies, it is good cause for the killing him, in salvation of his conies; for, having used to haunt the warren, he cannot otherwise be restrained." And Pop-HAM, C. J., said,—"The common use of England is, to kill dogs and cats in all warrens, as well as any vermin; which shows that the law hath been always taken to be, that they may well kill them."

*Athill* v. *Corbett*, Cro. Jac. 463, goes to show that a dog is a kind of property, for the taking of which trespass lies; but the case is too imperfectly reported to be useful on any other point.

In 2 Rol. Abr. 567, 1 33, it.is said that in *Lewin's case* it was held, if a man hunt with a dog in another's warren, the owner of the warren cannot justify killing the trespasser's dog with his own dog by his own incitation,—which probably means that the owner of the warren could not justify killing the trespasser's dog without reasonable necessity; that, as a matter of fact, the intruder, upon notice, would be likely to withdraw with his dog from the warren, and so prevent his doing further mischief therein; or that, for some other reason, the evidence did not show the fact of reasonable necessity.

*Barrington* v. *Turner*, 3 Lev. 28, was trespass for killing two dogs. The defendant pleaded that the dogs killed a deer in his park, upon which, to prevent more mischief by them, he took them and killed them. It was argued that the plea was bad; because, after the deer was killed, and the defendant had captured the dogs, it was not necessary to kill them: but the plea was held good.

*Wright* v. *Ramscot* (1 Saund. 82, 84; 1 Sid. 336; 1 Lev. 216; 2 Keb. 237; 3 Salk 139) was trespass for killing a mastiff dog with a knife. The de⸀ ᴅdant pleaded that the mastiff, in the street, ran vi⸀ lently upon ɘ ᴊ bit a dog of one Ellen Bagshaw; and the defendant as her serv .ɪt, killed the mastiff to save the other dog from being destroyed by the mastiff. This, plea was held bad, because it did not allege that it was necessary to kill the mastiff to save the other dog. The purpose of saving the other dog was alleged; but the defendant's purpose in killing the mastiff was not equivalent to a reasonable

necessity for killing him. Reasonable necessity was not alleged in general terms; nor was it alleged that the defendant could not otherwise part the dogs or take off the mastiff; nor were any facts alleged which, in the ancient strict construction of special pleading, could make a case of reasonable necessity. The decision, therefore, is not an authority against the doctrine of reasonable necessity; nor does it show what weight should be given to that contrast of values and consequences which would have helped to determine whether it was reasonably necessary to kill the mastiff if he had attacked something more valuable than another dog.

*Keck* v. *Halstead*, Lutw. 1494, was trespass for killing a dog. The defendant pleaded that the dog was very fierce, and accustomed to bite mankind, whereof the plaintiff had notice; that the dog entered the defendant's yard many times, and went back and forth through the yard barking and growling, and remained there a long time, namely, an hour at least at each time, so that the defendant and his family, from fear of being bitten by him, did not dare to go into the yard at those times to do their lawful business there freely and without fear or danger; that the defendant gave the plaintiff notice, and requested him to restrain the dog from entering the yard any more, to do which the plaintiff wholly neglected and refused; that the dog, unmuzzled, afterwards again fiercely entered the yard, and there remained, so that the defendant and his family, from fear of the dog and the danger of being bitten by him, did not dare to go into the yard to do their lawful business there; that the defendant, for that cause, could not have any use of his yard without killing the dog; wherefore he shot the dog, then being in his yard, for the security and preservation of himself and his family. After verdict for the defendant, on motion of the plaintiff in arrest of judgment, this plea was held good.

*Janson* v. *Brown*, 1 Camp. 41, was trespass for shooting a dog. The defendant, having pleaded the justification that the dog was worrying and attempting to kill a fowl of the defendant, and could not otherwise be prevented, offered to prove that just before the dog was shot, being accustomed to chase the defendant's poultry, he was worrying the fowl in question, and that he had not dropped it from his mouth above an instant when the piece was fired. Lord ELLENBOROUGH ruled that this would not make out the justification; to which it was necessary that, when the dog was shot, he should have been in the very act of killing the fowl, and could not be prevented from effecting his purpose by any other means. This ruling required the evidence to conform very strictly to the plea, which alleged that the dog was attempting to kill the fowl,—that is, was making the attempt at the very moment he was shot. But whether a plea that it was reasonably necessary to kill the dog to prevent his killing the fowl would have been a good plea, and whether the evidence offered would have been competent to be submitted to the jury in support of such a plea, were points not raised or considered. Upon the evidence offered, the jury might have found that the fowl, although dropped for an instant, was

in danger of being immediately caught up again and killed, and so was in imminent peril; and it would be strange if a plea could not be so drawn as to state a good defence in such a case. The dog might have been lawfully killed when he had the fowl in his mouth—*Leonard* v. *Wilkins*, 9 Johns. 233; and the fowl being wholly or partly in his mouth, or an inch, a foot, a rod, or twenty rods distant, is all a matter of degree and of fact for the consideration of the jury, on the question of the danger and the reasonable means of protecting the fowl.

*Vere* v. *Cawdor & King*, 11 East 568, was trespass for shooting a dog. King pleaded that he was Lord Cawdor's game-keeper; and because the dog was in Cawdor's manor, running after, chasing, and hunting divers hares, he shot him for the preservation of the said hares. This plea was held bad. It might have been properly held bad (as suggested by Ld. ELLENBOROUGH who delivered the opinion), because it did not state that the hares were put in peril so as to induce any necessity for killing the dog. But the decision appears to have been put on some other ground, not distinctly reported. It was held that the dog did not incur the penalty of death, and that the game-keeper had no right to kill him for running after the hares. The question whether the dog was putting them in imminent peril seems to have been regarded as immaterial. It may have been so held on the ground suggested by LE BLANC, J., during the argument, that the hares, not being reduced to possession like rabbits in a warren or deer in a park, were not the property of the owner of the land. In wild animals alive, fully grown and free, not domesticated, enclosed, or confined, which have in themselves a principle and power of motion, and can convey themselves from one part of the world to another, a man can have no absolute property. 2 Bl. Com. 389, 390, 411; 4 Bl. Com. 235; Com. Dig., title Biens (F); Bac. Ab., title Game; 3 Gr. Ev., sec. 163; Roscoe Cr. Ev. 454; *Hannam* v. *Mackett*, 2 B. & C. 934; *Blades* v. *Higgs*, 12 C. B. (N. S.) 501; 13 *id.* 844, 866; *Norton* v. *Ladd*, 5 N. H. 203. And the decision in *Vere* v. *Cawdor & King* may have been that, at common law, *King* had no right to kill the plaintiff's dog in defence of hares to which Cawdor had no title that he could set up against the dog; and that King, as Cawdor's game-keeper, was authorized, by the English statutes in relation to game, to "take and seize" the dog, but not to kill him. 22 and 23 Car. II, c. 25; Bac. Abr., title Game; *Deane* v. *Clayton*, 7 Taunt. 506, 511, 512, 517. Whatever the ground of the decision was, the case does not define the imminence of the danger which, at common law, justifies violence in the defence of property which the owner has a right to defend.

*Wells* v. *Head*, 4 C. & P. 568, was an action for shooting a dog. The dog had worried some sheep belonging to the defendant, but had left the field in which the sheep were, had crossed an adjoining close, and was in a third when the defendant shot him. ALDERSON, B., ruled that the plaintiff was entitled to a verdict, and said it was clear that the dog was not shot in protection of the defendant's property, as it was after he had left the field in which the sheep were. It might have been

proper for the jury to find that, as a matter of fact, upon peculiar cir-
cumstances in that case, the dog was not likely to return and renew his
attack, and that the danger had ceased; although a jury, acquainted
with the inveterate and irresistible impulses of sheep-killing dogs, would
probably be slow in arriving at that conclusion. If the ruling had been
intended to require the defendant to leave his sheep in jeopardy while
he went to give notice to the plantiff, or to stand guard over them and
to wait for a renewal of the attack when he would be likely to kill the
sheep by firing at the dog, the law, which allows everything reasonably
necessary to be done in defence, would not have been properly applied in
that case; but Baron ALDERSON seems merely to have declared that, as
a matter of fact, the sheep were in no danger. Reports of such cases
may mislead us if we follow the English habit of disregarding the dis-
tinction between law and fact, or take it for granted that every reported
case contains something more than an opinion of a court on a question
of fact.

*Protheroe* v. *Mathews*, 5 C. & P. 581, was trespass for shooting a dog.
A tram-road for coal wagons running through the park of one Morgan
was also used as a foot-way, and was not fenced off from the park.
The dog followed three women who were walking along this road, ran
off the road, chased deer in the park, and then returned to the women
in the road, and lay down within twenty yards of the gate by which
the women were going to leave the park; and in that situation the dog
was shot by the defendant, who was a servant of Morgan. TAUNTON, J.,
instructed the jury that it was not essential to the defence that the dog
should have been chasing the deer at the very moment he was shot;
that it was sufficient if the chasing of the deer and the killing of the
dog were all one and the same transaction; but that, if the chasing was
at an end, and would not have been recommenced, the plaintiff was
entitled to a verdict. In the present case, it was a question of fact for
the jury whether the chasing of the geese was at an end, or whether
it was likely to be recommenced.

*Morris* v. *Nugent*, 7 C. & P. 572, was trespass for shooting a dog.
The defendant pleaded that the dog attacked him, and would have
bitten him had he not defended himself. As the defendant was passing
the plaintiff's house, the dog ran out and bit the defendant's gaiter;
on the defendant's turning round and raising a gun which he had in
his hand, the dog ran away; and as he was running away, and before
he had got more than five yards off, the defendant shot and killed him.
Lord DENMAN ruled that the plaintiff was entitled to a verdict because
the dog was not attacking the defendant when he was shot. The de-
fendant, in pleading, put his case on the ground that the dog would
have bitten him if he had not defended himself; and REDFIELD, C. J.,
in *Brown* v. *Carpenter*, 26 Vt. 643, suggests that Lord DENMAN'S
ruling was made upon the form of the issue rather than the law of de-
fence. As a matter of fact, it might not have been absolutely neces-
sary to kill that dog at that time: but the defendant's right of defence
was to do what apparently was reasonably necessary, and, time enough

·having elapsed for the dog to run not more than five yards, it was a question for the jury whether the defendant, in the excitement and confusion of so sudden an attack and retreat, had such reasonable apprehensions as to justify his shot.   In some respects, there was less urgency in his case than there was in *Wells* v. *Head.*   He could have gone to the plaintiff's house and given notice to restrain the dog ; or, he could have gone about his business, without leaving unprotected sheep behind him ; if the attack were renewed, he could fire at the dog without pointing his gun at himself ; and the carniverous and blood-thirsty disposition of the dog might be less excited by biting a gaiter than by biting a sheep.   But whether the defendant was bound to be in a state of mind favorable for giving due weight to such considerations may be questionable.

*King* v. *Kline*, 6 Pa. St. 318, was an action for killing a dog.   The defendant proved that the dog was vicious, ferocious, and unruly, and had come upon his premises and abstracted some fish from the wall of his house where they had been hung to dry.   The defendant set a trap at that place, and the dog coming again was caught, and shot by the defendant.   The court instructed the jury if they believed the evidence given by the defendant, it was not of that nature which authorized him to kill the dog.   This instruction was held erroneous.

*Parrott* v. *Hartsfield*, 4 Dev. & Bat. 110, was trespass for killing a dog.   The defendant proved that the dog had killed some of his sheep in his pasture ; the defendant, being notified of the fact, went in pursuit with a gun ; the dog escaped at that time, but returned about two hours afterwards to the premises of the defendant, and was near the pasture fence where the sheep were, when the defendant saw him and immediately shot him.   The plaintiff insisted that in order to support the plea of justification, the defendant must prove that he could not otherwise preserve his sheep than by killing the dog, or that the dog was shot in the very act of killing the sheep.   The court instructed the jury that the defendant was justified in killing the dog, if the evidence satisfied them that the dog had destroyed the sheep, and had returned two hours thereafter, and was on the premises of the defendant near his pasture, under circumstances calculated to produce a belief, in an ordinary man, that the dog was lurking about the enclosure to commence again the work of destruction, and was killed under a reasonable apprehension that it was necessary, to prevent a repetition of the mischief.   The defendant had a verdict and judgment, and, on appeal, the instructions were held correct, GASTON, J., delivering the opinion of the court.   It had happened that the dog killed some of the defendant's sheep : but that was merely a piece of evidence bearing upon the question of reasonable apprehension, which was a question of fact for the jury : if he had been interrupted before overtaking ·the objects of his pursuit, as the minks were in the present case, the .pursuit would have been evidence on which the jury might have found danger, or a reasonable apprehension of ,it.

*Perry* v. *Phipps*, 10 Ired. 259, was trespass for killing a dog.   The

defendant, going into the plaintiff's yard, would probably have been bitten by the plaintiff's dog if the dog had not been driven off by the plaintiff's family : while the dog was retreating, and at the distance of ten steps from the defendant, the defendant shot him.   The court instructed the jury that they might infer that the defendant did not shoot the dog to protect himself; and it was held that the circumstances were properly left to the jury as evidence on which they might find that the defendant did not act on the defensive.

*Morse* v. *Nixon*, 6 Jones (N. C.) 293, was trespass for killing a hog. ·For the purpose of showing that it had the reputation of a chicken-eating hog, the defendant proved that it had killed one chicken, and attempted to kill another.   It does not appear whose chickens they were, or when they were attacked ; it is to be inferred from the decision that they were not the defendant's.   There was evidence that the hog, when killed, was about seventy-five yards from the public road, near the fence of the defendant, where his chickens were in the habit of running.   There was no evidence that the hog, at the time it was killed, was in the act of doing any injury to the defendant or his property. The court charged the jury, that if they believed the ·hog was of a predatory character, and had the character of a chicken-eating hog, then they would find for the defendant, as any man had a right to abate a public nuisance.   These instructions were held erroneous.   And they clearly were erroneous in holding, as matter of law, that a hog of a predatory and chicken-eating character was a public nuisance which any man had a right to abate, without regard to the reasonable necessity of the particular case.   The decision recognizes a distinction between the reasonable necessity of killing a hog, and the reasonable necessity of killing a dog.

It has been held that a dangerous dog running at large is a common enemy and a nuisance, and that his destruction is justifiable, though not necessary to prevent any mischief impending at the moment. *Putnam* v. *Payne*, 13 Johns. 312 ; *Hinckley* v. *Emerson*, 4 Cow. 351 ; *Loomis* v. *Terry*, 17 Wend. 500 ; *Maxwell* v. *Palmerton*, 21 Wend. 407 ; *Dunlap* v. *Snyder*, 17 Barb. 566 ; *Brown* v. *Carpenter*, 26 Vt. 638 ; *Bowers* v. *Fitzrandolph*, Addison 215 ; *King* v. *Kline*, 6 Pa. St. 318 ; *Dodson* v. *Mock*, 4 Dev. & Bat. 146 ; *Perry* v. *Phipps*, 10 Ired. 261 ; *Woolf* v. *Chalker*, 31 Conn. 121, 128, 130 ; *Parker* v. *Mise*, 27 Ala. 483.   This class of cases, understood as maintaining the right of destruction when its exercise is a reasonably necessary protection of the persons or property of those claiming the right, or of the persons or property of others* for whom they are, in law or in fact, authorized to act—3 Bl. Com. 5 ; 1 Bishop Cr. L., secs. 716–721, 851, 877 ; *Fuller* v. *Bean*, 30 N. H. 181 ; *Graves* v. *Shattuck*, 35 N. H. 269 ; *A. M. Co.* v. *Goodale*, 46 N. H. 56 ; *Brown* v. *Perkins*, 12 Gray 89 ; *Morse* v. *Nixon*, 6 Jones (N. C.) 295—seems to be unobjectionable.   In dealing with the right of defence, courts have fallen into some conflict and

---

*Horrigan and Thompson Cases on Self-Defence 738–757.                   REPORTER.

confusion, as courts always will when they inadvertently turn a broad question of fact into a narrow question of law.   It is easy to abandon the comprehensive rule of the reasonable necessity of the case, which is the whole law of defence; but it is not so easy to invade the province of the jury, and establish a legal test of reasonable necessity exactly adapted to the peculiar circumstances of every case that can arise.

The tests of reasonable necessity, which have been applied to cases of defensive homicide, cannot be applied to the defensive killing of minks.   The authorities are, that a man may oppose a deadly resistance to a felonious attack, but not to a mere trespass (a trespass against a man's castle* being sometimes excepted—3 Gr. Ev., sec. 117 ; 1 East P. C., ch. 5, sec. 56 ; *Com.* v. *Drew*, 4 Mass. 391, 396 ; Ros. Cr. Ev. 770 ; 1 Bishop Cr. L., sec. 858, 5th ed.).   A man, in defence of his possession of land or goods, " may justify an assault and battery ; but he cannot justify either mayheming or wounding, or mannas of life and member ; and so note a diversity between the defence of his person and the defence of his possession or goods."   2 Inst. 316.   Where the trespass is barely against property, " the law does not admit the force of the provocation sufficient to warrant the owner in making use of any deadly or dangerous weapon."   1 East P. C., ch. 5, sec. 56. But a man, upon whom or whose property another manifestly intends to commit a known felony by violence or surprise, is not obliged to retreat ; on the contrary, he may pursue his adversary, and kill him if necessary to prevent the felony.   1 East P. C., ch. 5, secs. 44, 45 ; 3 Gr. Ev., sec. 115 ; 4 Bl. Com. 180 ; Fost. Cr. L. 274.

" Where a crime, in itself capital, is endeavored to be committed by force, it is lawful to repel that force by the death of the party attempting :" but " the law of England" will not " suffer with impunity any crime to be *prevented* by death, unless the same, if committed, would also be *punished* by death."   4 Bl. Com. 181, 182 ; 1 Bishop Cr. L., sec. 849, 5th ed.   The rule generally laid down is, that a deadly resistance is lawful only against an apparent, forcible felony,—the idea of felony being " so generally connected with that of capital punishment that we find it hard to separate them."   4 Bl. Com. 98.   "It is a melancholy truth, that among the variety of actions which men are daily liable to commit, no less than a hundred and sixty have been declared by act of parliament to be felonies without benefit of clergy; or, in other words, to be worthy of instant death."   4 Bl. Com. 18.   So long a list might perhaps be made to enumerate all, and even more than all, the attacks which it would ordinarily be reasonably necessary to resist unto the death of the attacking party ; but such a list, attached as a limitation to the doctrine of defence, would be an attempt to turn the fact of reasonable necessity into an absolute and arbitrary schedule of legal rules that would be likely to operate very unjustly in some cases, because of the difficulty of foreseeing and providing for the infinite variety of circumstances and the illimitable diversity of considerations

---

*Horrigan and Thompson Cases on Self-Defence 795–862.                REPORTER.

that might be involved in so broad a question as the kind, degree, and time of defence reasonably necessary for person or property. If the rule stated by Blackstone were adopted, and defensive homicide were allowed only to prevent a capital crime, it would not be allowed in any case in this state at the present time, except when necessary to prevent murder in the first degree. Such is not understood to be the law. *Gray* v. *Coombs*, 7 J. J. Marsh. 478. If the old English list of one hundred and sixty capital crimes were the legal catalogue of attacks to which, when violent, a deadly resistance might be made, the law would be very different from what it is now generally supposed to be.

If, according to the general rule of the common-law authorities, it may be reasonably necessary, for the reason stated by Blackstone, to kill a man only to prevent his committing a capital crime, how can the rule survive the reason on which it was founded ? If, by some inscrutable process, it does survive,—if the distinction between a felony and a mere trespass is still a test,—this defendant, although he might kill a man if necessary to prevent his forcibly committing the felony of stealing a goose—4 Bl. Com. 237 ; *Lyford* v. *Farrar*, 31 N. H. 314— yet could not kill him to prevent his stealing things of far greater value, being real or savoring of the realty, or bonds, bills, notes, or other evidences of or securities for debts or other choses in action— 4 Bl. Com. 232, 234 ; 1 Hawk. P. C., ch. 33, secs. 21, 22—or committing a vast amount of malicious mischief—4 Bl. Com. 243 ; *Com.* v. *Keith*, 8 Met. 531. If such recondite, arbitrary, and irrational tests are to be employed, the right of defence, guaranteed by the constitution as a natural, essential, and inherent right, is a very unnatural and dangerous one ; for, in a great number of cases, however reasonably necessary a deadly defence might be, no one, without a lawyer's technical knowledge, could make such a defence without running great risk of the gallows. But, suppose the defendant had been a profound lawyer; had known perfectly well that it might be reasonably necessary, by homicide, to prevent an apparent, violent felony, but not a trespass or misdemeanor ; had thoroughly understood the general rule, and all the qualifications, exceptions, and nice distinctions to be found in the books on the subject; and had been able to reconcile or otherwise dispose of conflicting precedents and opinions, and accurately to remember and exactly apply all the authorities, at an instant's notice, in excitement and disturbance,—his learning in that branch of the law would have availed him nothing in the adjustment of his defensive measures to the reasonable necessity of the case presented by these minks, but would, if relied upon, have greatly increased his embarrassment. The distinction between felony and trespass attempted by the aggressor, which has been supposed to be in general a test of the right to kill him, like all other tests devised in former times to illustrate the predominance of the sanctity of human life among the considerations of reasonable necessity, is inapplicable to the present case.

One who finds game, that is, wild animals fit for food, on his own ground, cannot justify pursuing them into the land of another. *Deane*

v. *Clayton*, 7 Taunt. 489.    But in *Mitten* v. *Faudrye*, Popham 161, DOD-
ERIDGE, J., said,—"In the time of Chief Justice POPHAM, this case was
adjudged in this court: trespass was brought for hunting, and breaking
of hedges; and the case was, that a man started a fox in his own land,
and his hounds pursued him into another man's lands, and it was
holden that he may hunt and pursue him into any man's land, because
a fox is a noysome creature to the commonwealth." And other author-
ities hold that a man may justify an entry and a reasonable trespass
upon another's land for killing mischievous vermin, that is, wild ani-
mals not fit for food. *Gundry* v. *Feltham*, 1 D. & E. 334; *Nicholas* v.
*Badger*, cited in 3 D. & E. 259, note *a ;* Bac. Abr., title Game.    Wild
ducks being valuable, an action lies for frightening them from a decoy
pond; and grouse being valuable, an action lies for frightening them
away from a man's land. *Carrington* v. *Taylor*, 11 East 571; *Keeble* v.
*Hickeringill*, 11 East 574, note; 11 Mod. 74; 3 Salk. 9; Holt 14, 17,
19; *Ibottsow* v. *Peat*, 3 H. & C. 644.    But rooks being worthless and
destructive, it has been held that no action lies for frightening them
away from a man's premises. *Hannam* v. *Mockett*, 2 B. & C. 934.    In
the latter case, BAYLEY, J., delivering the opinion of the court, said,—
"In considering a claim of this kind, the nature and properties of the
birds are not immaterial.    The law makes a distinction between animals
fitted for food, and those which are not; between those which are
destructive to private property, and those which are not; between those
which have received protection by common law or by statute, and those
which have not.    It is not alleged in this declaration that these rooks
were fit for food; and we know, in fact, that they are not generally so
used."    Whether all the English authorities on the subject are or are not
in every particular sound, and adapted to the condition of this country,
they at least tend to show that (with perhaps some exceptions not
pertinent to the present inquiry) mischievous vermin, alive and free,
including all classes of noxious wild animals,—beasts, birds, insects,
and reptiles,—not fit for food, are worthless in the estimation of the
common law.

"Larciny cannot be committed in some things, whereof the owner
may have a lawful property, and such whereupon he may maintain an
action of trespass, in respect of the baseness of their nature, as mas-
tiffs, spaniels, gray-hounds, blood-hounds, or of some things wild by
nature, yet reclaimed by art or industry, as bears, foxes, ferrets, &c.,
or their whelps, or calves, because, tho reclaimed, they serve not for
food but pleasure, and so differ from pheasants, swans, &c., made tame,
which, tho wild by nature, serve for food."    1 Hale P. C. 511, 512;
*Rex* v. *Searing*, Russ. & Ry. 350; *Norton* v. *Ladd*, 5 N. H. 203; *Warren*
v. *State*, 1 Greene (Iowa) 106, 111.    "Of all valuable domestic animals,
as horses and other beasts of draught, and of all animals *domitae na-
turae*, which serve for food, as neat or other cattle, swine, poultry, and
the like,    *    *    larceny may be committed; and also of the flesh of
such as are either *domitae* or *ferae naturae*, when killed.    As to those
animals which do not serve for food, and which therefore the law holds

to have no intrinsic value, as dogs of all sorts, and other creatures kept for whim and pleasure, though a man may have a base property therein and maintain a civil action for the loss of them, yet they are not of such estimation as that the crime of stealing them amounts to larceny." 4 Bl. Com. 236, **235 ; 2 *id.* 393.

"The taking   *   *   of any creatures whatsoever which are *domitae naturae*, and fit for food, as ducks, hens, geese,   *   *   may be felony ;" but subjects of larceny "ought not to be things of a base nature, as dogs, cats, bears, foxes, monkeys, ferrets, and the like, which, howsoever they may be valued by the owner, shall never be so highly regarded by the law, that for their sakes a man shall die." 1 Hawk. P. C., ch. 33, secs. 28, 23. For the sake of vermin, though tame and in some sense valuable, a man shall not die. Capital punishment for stealing a domesticated goose, but not for stealing a domesticated mink, —such is the discriminating discipline of the common law. Human life of inestimable value; domesticated animals, valuable for food or for practical use, far less worthy than the human species; domesticated vermin less worthy still; mischievous wild vermin, a public nuisance, —such is the common-law appraisal. Under this system, the malicious destroyer of human life is liable to indictment and death, but not to a civil action, for ancient reasons difficult to be now discovered, possibly of theological origin—Exodus xxi, 12, 18, 19, 22, 23 ; Leviticus xxiv, 17, 18 ; Numbers xxxv, 31—possibly derived from the difference between human life which no man owns, and other life which may be the subject of property — *Wyatt* v. *Williams*, 43 N. H. 102 ; the malicious destroyer of property in domesticated brutish life is liable to an action for the damage to property, but not to indictment; the felonious taker of another's domesticated animals, of the class recognized by the law as fit for food or otherwise useful or profitable, is liable to an indictment and an action; the taker of another's domesticated animals of the vermin class is liable to an action, but not to indictment; the taker on another's land of wild animals alive and free is liable, for the taking, neither to an action nor an indictment. Whether these distinctions are, in detail, sound or unsound, and whether some of them do or do not cease to exist when larceny ceases to be a capital crime, they at least show a general recognition of a gradation of values; and if the common law furnishes no fixed and definite standard for a pecuniary measurement of the differences in the legal values of the various orders of creation, it does recognize mankind as far above, and wild vermin as far below, domestic poultry. And the test of the reasonable necessity of killing an individual of the highest order, emanating from the peculiar worth of that order, cannot be deduced from the peculiar worthlessness of the lowest. If the legal sacredness of all human life, ranking far above the value of property, is the sole reason for holding it reasonably necessary that an owner of property should submit to a trespass which he can only prevent by destroying such life, the legal inferiority of vermin life in its wild state, too base to be admitted to the lowest rank of property, is a sufficient reason for holding it reason-

ably necessary that an owner of property should prevent a trespass by the prompt destruction of such life. And if the remedy of an action at law for slight injuries—3 Bl. Com. 4 ; 4 *id.* 185 ; 1 Hale P. C. 481 ; 2 Bishop Cr. L., sec. 641—is an additional reason for requiring scrupulous care in resisting a felon, and for not killing a human trespasser at all, the absence of such a remedy in this case was an additional reason for using some other than inadequate measures of extreme gentleness, and for instantly employing a remedy likely to be lost by delay.

Perhaps the statute upon which this suit is brought is to be regarded as elevating minks above the base character and position held by them at common law. But it does not elevate them to the rank of property, nor take them out of the class of wild vermin. And whatever elevation there is is intermittent, occurring only during a portion of each year. The statute is not a prohibition of killing them, but a regulation of the time when they may be killed, enacted not out of any tenderness for them. The object of the statute, hinted at in the title of the original act—Laws 1866, ch. 4228—is, not that these "fur-bearing animals" shall not be killed, but that there may be more of them to be killed, and that killing them may be a more lucrative business. In the case of a man, the law surrounds his life with unparalleled safeguards for the sake of his life conclusively presumed to be of incalculable value : in the case of a mink, it is not his life, but his pelt, that the statute takes an interest in. How impossible then it is to apply the severe tests of reasonably necessary defensive homicide, founded upon grand considerations of the sacredness of human life, to the reasonably necessary defensive destruction of vermin life, so far from being sacred in the contemplation of the statute and the common law. And when the rule of imminent danger has been so much applied in cases of homicide as to acquire a peculiar technical meaning, founded on and adapted to the sacredness of the subject-matter of those cases, how probable it is that such a rule, applied to a case like this, without the qualifications and explanations necessary to adapt it to the subject-matter of the suit, would convey erroneous ideas of the law, mislead the defendant and the jury, and work injustice.

The quantity, quality, and time of justifiable defensive force depend upon the reasonable necessity of each case ; and that reasonable necessity, depending upon the particular circumstances of the case, is a question of fact, like a question of reasonable use of land or water— *Bassett* v. *S. M. Co.*, 43 N. H. 569 ; *Swett* v. *Cutts*, 50 N. H. 439 ; *Hayes* v. *Waldron*, 44 N. H. 580—or reasonable time—*Favor* v. *Philbrick*, 5 N. H. 358 ; *Goodall* v. *Streeter*, 16 N. H. 97 ; *Barker* v. *Barker*, 16 N. H. 335 ; *Watson* v. *Walker*, 23 N. H. 492 ; *Tufts* v. *Hayes*, 31 N. H. 138 ; *Knowlton* v. *Tilton*, 38 N. H. 263 ; *Odlin* v. *Gove*, 41 N. H. 476 ; *Tyler* v. *Webster*, 43 N. H. 147 ; *State* v. *Plaisted*, 43 N. H. 413 ; *Wallace* v. *Co.*, 44 N. H. 523 ; 2 Kent Com. 480 *(contra, Morse* v. *Bellows*, 7 N. H. 549, 566 ;—in *Concord Bank* v. *Gregg*, 14 N. H. 331, and *Doe* v. *Thompson*, 22 N. H. 217, the court found the fact from the evidence which

was apparently submitted to the court)—or reasonable place—*Currier*
v. *Currier,* 2 N. H. 75 ; *Flanders* v. *Lamphear,* 9 N. H. 201 ; *Rhoades* v.
*Parker,* 10 N. H. 86 ; *Holmes* v. *Fisher,* 13 N. H. 9 ; *Miles* v. *Roberts,*
34 N. H. 254—or reasonable cause to believe a man guilty—*Eastman*
v. *Keazor,* 44 N. H. 5,18, 520 ; *Lister* v. *Perryman,* L. R., 4 H. L. 521—
or reasonable cause to believe a dog vicious—*Kittredge* v. *Elliott,* 16
N. H. 77, 82—or reasonable sufficiency of a highway—*Johnson* v. *Ha-
verhill,* 35 N. H. 74 ; *Hall* v. *Manchester,* 40 N. H. 410 ; *Clark* v.
*Barrington,* 41 N. H. 44,.52 ; *Howe* v. *Plainfield,* 41 N. H. 135, 138 ;
*Winship* v. *Enfield,*· 42 N. H. 197 ; *Chamberlain* v. *Enfield,* 43 N. H.
356—or reasonable care in using a highway—*Carlton* v. *Bath,* 22 N. H.
559 ; *Palmer* v. *Portsmouth,* 43 N. H. 265—or reasonable care, dili-
gence, or skill, in bailment and other cases—*Leighton* v. *Sargent,* 27
N. H. 460 ; *Shepley* v. *Felt,* 3 N. H. 121 ; *Dow* v. *Sayward,* 12 N. H.
271.

The usual pretext for turning fact into law, is the convenience
and importance of certainty and minute specification in the rules of
action, by which, men are required to govern themselves. 1 Bishop
Cr. L., sec. 855 ; *Gray* v. *Jackson,* 51 N. H. 36. But, if turning the
fact of reasonable necessity into a matter of law has been practically
useful in cases of homicide and assault, the same metamorphosis ex-
tended, without limitation, to cases like this, would be productive of
serious inconvenience and uncertainty. When the defendant was con-
sidering what to do, how much would he have been aided by advice to
beware of violating the law, and suspend defensive operations, until he
had first tested the reasonable necessity of shooting, by such criteria
as the distinction between trespass and felony, the dogma requiring a
request to depart (modified as it is in cases of trespass *vi et armis*), the
plea of *son assault demesne,* and the doctrine of *molliter manus imposuit?*
How much certainty would he have derived from such a warning?
It would seem to him that things had come to a strange pass if a man
could not, without going through a course of legal study, be qualified
to judge of the reasonable necessity of shooting minks caught in the
act of chasing his geese, and taking forcible possession of his pond.
And, if he had happened to be conversant with the doctrine of immi-
nent danger, as it is generally laid down in reported cases of homicide
and assault, instead of his course being cleared by that kind of knowl-
edge, he would, by its guidance, have been plunged into inextricable
difficulty. Applying that rule of imminent danger, he would probably
conclude that he could not lawfully fire at the minks until they came
so near their prey that his defence would be· as dangerous as their
attack.

" All our jurists hold that a· certain quantity of risk to life or limb
justifies a man in shooting or stabbing an assailant; but they have
long since given up in despair the attempt to describe, in precise words,
that quantity of risk. They only say that it must be, not a slight risk,
but a risk such as would cause serious apprehensions to a man of firm
mind : and who will undertake to say what is ·the precise amount of

apprehension which deserves to be called serious, or what is the precise texture of mind which deserves to be called firm ? It is doubtless to be regretted that the nature of words and the nature of things do not admit of more accurate legislation.   *   *   A man beset by assassins is not bound to let himself be tortured and butchered without using his weapons, because nobody has ever been able precisely to define the amount of danger which justifies homicide." 2 Macaulay Hist. Eng. 368, 369 (Am. ed., 1849).

III. The claim that the defendant was liable if the geese could have been protected by driving them away from the minks, cannot be sus-. tained.

Requiring the defendant to drive away the minks if he could, is an admission that he had a right to drive them away, and that they had no right to remain on his premises without his consent.   But requiring him, if he could not drive them away from the geese, to drive the geese away from them, is a practical denial of his right to keep geese in his own pond or on his own land, if he could only keep them there by killing minks.   It amounts to this : it being impracticable to permanently eject the assailants, he must banish the assailed ; and the raising of geese being impossible, the raising of minks is compulsory.   A freeholder, permitted to fire blank cartridges only to cover the endless retreat of his poultry before these marauders, and obliged to suffer such an enemy to ravage his lands and waters with boldness generated by impunity, is a result of turning the fact of the reasonable necessity of retreating to the wall before a human assailant into a universal rule of law. This rule practically compels the defendant to bring his poultry to the block prematurely, and to abandon an important branch of agricultural industry.   His right of protecting his fowls is merely his right of exterminating them.

Not only is one species of his personal property extinguished, the freedom of rural life restricted, and a profit of husbandry cut off, but he is forced to surrender his domain to hostile occupation,—his rights in real estate are materially impaired.   The fee, to be sure, remains in him ; but he involuntarily holds it in trust for the use of others, whom he is physically unable to expel, because the only defensive measure that would be effectual is prohibited.   If the use of his land is taken from him for a private purpose, how can his constitutional right of acquiring and possessing property be thus infringed ?   If the use is a public one, how can his right be taken without compensation ?   *Ash* v. *Cummings*, 50 N. H. 591, *Aiken* v. *B. C. & M. R. R.*, 51 N. H. 504, and other cases, admit the land-owner's freedom from the invasion of private use ; and maintain his right to compensation for the inundation of his land for public use,—a use less inconsistent with the business of raising aquatic poultry, than the use of his land as a camp and nursery for destructive vermin.   His right of compensation is annihilated ; and his right of defence, established by the primary law of nature, and guaranteed by the common law and the constitution, is reduced to an aggravating abstraction by the error of giving to vermin

the benefit of a test of the reasonable necessity of defensive homicide, founded on the transcendent legal worth of human life.

It is reasonably necessary that the person who kills another in his own defence should have first retreated as far as he conveniently or safely can, to avoid the violence of the assault. And though, under some circumstances, in a time of war, it may be a reproach to flee from the public enemy; yet, between two citizens under the same government in a time of peace, " the law countenances no such point of honour, because the king and his courts are the *vindices injuriarum,* and will give to the party wronged all the satisfaction he deserves.    *    * The party assaulted must therefore flee as far as he conveniently can, either by reason of some wall, ditch, or other impediment, or as far as the fierceness of the assault will permit him." 4 Bl. Com. 185; 1 Hale P. C. 481. This maxim of retreating to the wall is a statement of fact properly illustrating the weight to be given to the sanctity of human life in determining the reasonable necessity of killing a human being. It has been turned into law, and applied, as a rule of law, in cases of homicide, where the accused set up, in justification, the prevention of a felony; but it is not applicable to the defensive destruction of vermin.

What authorities are there requiring a retreat in this case? None have been found, though diligent search has been made. In *Wadhurst* v. *Damme,* Cro. Jac. 45, it was not supposed that the defendant was liable on the ground that he could have saved the conies, who were rightfully in the warren, by driving them away from the plaintiff's dog who was wrongfully there. In *Barrington* v. *Turner,* 3 Levinz 28, and *Protheroe* v. *Mathews,* 5 C. & P. 581, it was not claimed that the defendants' liability for killing the dogs depended upon their ability to save the deer who were rightfully in the parks, by driving them away from the dogs who were wrongfully there. In *Keck* v. *Halstead,* Lutw. 1494, it was not held that the defendant should not kill the dog, so long as he and his family could retreat into his house. In *Wells* v. *Head,* 4 C. & P. 568, and *Parrott* v. *Hartsfield,* 4 Dev. & Bat. 110, no one imagined that the defendants were bound to drive their own sheep, who were on their own land, away from trespassing dogs, if by that means the sheep could be saved. In *Morris* v. *Nugent,* 7 C. & P. 572, the idea was not advanced that a man attacked by a dog in the highway cannot kill the dog if he can save himself by taking to flight. In *King* v. *Kline,* 6 Pa. St. 318, there is no intimation that the law required the defendant to hang his fish higher out of the dog's reach. In *Morse* v. *Nixon,* 6 Jones (N. C.) 293, if the plaintiff's hog had been in the defendant's poultry-yard, and could not have been driven out, the plaintiff would hardly have urged that it was the legal duty of the defendant to drive his poultry out, and surrender the possession and control of his land to a destructive brute. In *Brill* v. *Flagler,* 23 Wend. 354, when the plaintiff's dog was howling around the defendant's house, night and day, the plaintiff did not suggest the reasonable necessity of the defendant and his family seeking repose elsewhere, and running away from the howling instead of stopping it.

To hold, in this case, that the geese should have been driven away from their home, would be equivalent to holding that they should have been killed. The doctrine of retreat would leave them a right to nothing but life in some place inaccessible to minks, where life might be unremunerative and burdensome. But that doctrine being irrelevant when the aggressor is not shielded by the inviolability of the human form and the sacred quality of human life, the geese were not bound to retreat. As against the minks, they had a right not only to live, but to live where the defendant chose, on his soil and pond, and to enjoy such food, drink, and sanitary privileges as they found there, unmolested by these vermin, in a state of tranquillity conducive to their profitable nurture. And it was for the jury to say, not whether he could have driven them away from the minks, but whether his shot was reasonably necessary for the protection of his property, considering what adequate and economical means of permanent protection were available, the legal valuation of vermin life, and the disturbance and mischief likely to be wrought upon his real and personal estate if any other than a sanguinary defence were adopted.

The plaintiff's claim, if upheld, would reach far beyond an unjust judgment taking from this defendant the sum of forty dollars and costs. It would establish a principle of law, novel in theory and practice, subversive of the authorities, extensive in its operation, and pernicious in its effect. If the defendant's geese were bound to retreat before these vermin, it follows that horses, cattle, sheep, swine, and poultry are bound, at common law, to retreat and to be driven by their owners from their own land, if retreat is possible, regardless of course or distance, before every dog that chooses to attack them : if A's dog besets B's house, and exhibits an inclination to attack the occupants when they come out, they must remain shut up till he sees fit to raise the siege ; friends who would come to their relief can do nothing but retreat ; and, the law of retreat not being limited to any particular lines, every person, on his own land or in the highway, menaced by another's dog, is bound not to use a deadly weapon, if he can escape by taking refuge in a tree and remaining there an indefinite period ; and, in many ways, the human industries and liberties of the country are subject to interruptions, hindrances, and restrictions not heretofore judicially established or practically acknowledged. In a practical view, the perils, inconveniences, and damages caused by perverse and unruly animals, under such a system of brutish dominion, assume a serious aspect. In a legal view, the expansion of the duty of retreat is a contraction of the natural and constitutional right of defending person and property.

*Verdict set aside.*